UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Johnny James Crow, | No. 23-cv-2403 (KMM/TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| Eric Lee Rasmussen, Andrew Timothy Ruden, and The City of Minneapolis, | |
| Defendants. | |

This case arises out of the mistaken and unfortunate detention of Johnny Crow by officers of the Minneapolis Police Department. Mr. Crow brought this two-count action against the City of Minneapolis ("the City") and Minneapolis Police Officers Eric Lee Rasmussen and Andrew Timothy Ruden ("the Officers"). The Complaint raises a 42 U.S.C. § 1983 claim for excessive force and unlawful arrest in violation of the Fourth Amendment and Fourteenth Amendment. Compl. (Doc. 1). It also includes a Minnesota state law claim for false arrest. *Id.* The Defendants answered the Complaint and now move for judgment on the pleadings pursuant to Rule 12(c). Ans., (Doc. 7); Defs.' Mot. (Doc. 15). The Defendants argue that Mr. Crow's detention did not constitute an arrest and that he was not subjected to excessive force, while also arguing that the Officers and the City are protected by both qualified and official immunity. The Court heard oral argument on Defendants' Motion on December 14, 2023. For the reasons that follow, the Court grants Defendants' Motion.

1

I.   **Background**[1]

On November 9, 2022, Mr. Crow was sitting in his red Toyota Corolla at a Minneapolis gas station. Compl. ¶ 7; Ex. 1 at 0:49 (Doc. 8). Minneapolis Police Officers Rasmussen and Ruden pulled up behind Crow and activated their emergency lights. Compl. ¶¶ 9–10. As the Officers arrived, Officer Ruden accessed a data system in the patrol car. Ex. 1 at 0:01; Ex. 2 at 0:01 (Doc. 8). This system provided officers with National Crime Information Center (NCIC) information about the car, including its connection to both Mr. Crow and Narcisse Redkettle. The NCIC information indicated that there was an open valid warrant for Mr. Redkettle for "5th degree drugs," described him as a "wanted person," and stated "caution combative." Ex. 3 (Doc. 9). The system also identified Mr. Redkettle as five foot eleven inches tall, 160 pounds, and with scars on his face, forehead, left calf, left hand, and left wrist. *Id.* It included a long list of aliases for Mr. Redkettle, one of which is Johnny James Crow. *Id.*

The Officers approached Mr. Crow's car and ordered him to step out of his vehicle, face away from the Officers, and place his hands behind his back. Compl. ¶¶ 11–12; Ex. 1 at 0:50. Mr. Crow complied with all of the Officers' commands. *Id.* He asked the Officers what is going on, but received no response. Compl. ¶¶ 13, 16; Ex. 1 at 0:59. As the officers began to place Mr. Crow in handcuffs, they asked if he was the registered owner of the car. Compl. ¶ 14; Ex. 1 at 1:00. Mr. Crow responded that he is Johnny Crow. Compl. ¶ 15; Ex. 1 at 1:02. Officer Rasmussen asked if the name is Redkettle, to which Mr. Crow responded, "No. Crow, Johnny Crow." Compl. ¶ 17; Ex. 1 at 1:05. Officer Rasmussen hesitantly acknowledged the response before continuing to handcuff Crow. Ex. 1 at 1:08. Officer Ruden stated that the Officers would check his identification

---

[1] The facts in this section are taken from both the allegations in the Complaint as well as body-worn video footage of the incident. See *infra* Part II.B for discussion on the inclusion of the body-worn video footage.

and asked Crow if he owned the vehicle. Mr. Crow confirmed that he did. *Id.* at 1:10. Officer Rasmussen stated that the car was registered to someone with multiple felony warrants with the name Redkettle. *Id.* at 1:14. Mr. Crow confirmed that he has relatives with that last name. Compl. ¶ 18; Ex. 1 at 1:22. Mr. Crow told the Officers that his identification was in his wallet in his car, and where they could find it. Compl. ¶ 19; Ex. 1 at 1:26.

As the Officers escorted a handcuffed Mr. Crow to their patrol vehicle, they told him they would confirm whether he was the person with the warrant. Ex. 1 at 1:28. Mr. Crow responded that he understood and reiterated that he has relatives with felonies. *Id.* at 1:33. He said that "this is messed up." *Id.* The Officers patted Mr. Crow down and confirmed that he did not have any weapons. Compl. ¶ 21; Ex. 1 at 1:39. Mr. Crow expressed his confusion about why his car would have warrants linked to it and told the Officers that he has relatives with the last name Redkettle that he did not associate with. Ex. 1 at 1:47. The Officers placed Mr. Crow in the backseat of their patrol car, noting how small it is, and closed the door. Compl. ¶ 22; Ex. 2 at 2:17. Mr. Crow remained handcuffed throughout this encounter.

Next, Officer Rasmussen again accessed the data system in the patrol car's on-board laptop computer. Ex. 1 at 2:13. As he did so, Officer Ruden returned to Mr. Crow's vehicle, retrieved Crow's identification from his gym bag, and eventually reviewed it against the data system in the patrol car. Ex. 2 at 2:39. The NCIC system listed Mr. Crow as six feet tall and 180 pounds. Ex. 3. After reviewing the NCIC information further, Officer Rasmussen opened the rear passenger door of the patrol car and asked Mr. Crow if he knows Narcisse Redkettle. Ex. 1 at 2:59. Mr. Crow explained that Redkettle is his cousin and has used Mr. Crow's name in the past. *Id.* at 3:04–07. During this discussion, Mr. Crow is visibly physically uncomfortable sitting with his hands behind his back in the patrol car. *Id.* at 3:38. The Officers talked further with Mr. Crow and determined

3

that he was not the subject of the open warrant. Compl. ¶ 23; Ex. 1 at 3:50. As the Officers assisted Mr. Crow out of the car, he grimaced and groaned in discomfort. Ex. 1 at 3:56. Mr. Crow was in the squad car for less than two minutes. Ex. 1 at 3:59; Ex. 2 at 2:08–3:57. Officer Rasmussen apologized to Mr. Crow twice and unlocked the handcuffs. Compl. ¶ 24; Ex. 1 at 3:56. Mr. Crow was handcuffed for less than three minutes. The Officers told Mr. Crow that he was free to go and that he should contact the Minnesota Bureau of Criminal Apprehension to remove the connection of Mr. Redkettle's warrants from his car. Compl. ¶ 25; Ex. 1 at 4:32. The entire encounter lasted less than five minutes.

Based on these events, Mr. Crow claims that the Officers violated his constitutional right to be free from unreasonable search and seizure and engaged in conduct amounting to the common-law tort of false arrest. Defendants argue that they are entitled to judgment on the pleadings.

## II.   Analysis

### A.   Standard

A motion for judgment on the pleadings pursuant to Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The distinction between a Rule 12(c) motion and a 12(b)(6) motion is "purely formal." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual allegations to state a claim to relief that is plausible on its face." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quotation omitted). The facts alleged in the complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

4

(2009) (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, the court takes all factual allegations in the complaint as true and construes all reasonable inferences therefrom in favor of the plaintiff. *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019). However, the court does not take as true wholly conclusory allegations or the legal arguments offered by the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).

**B.     Record Before the Court**

Defendants filed four exhibits along with their Answer. Exhibits 1 and 2 are footage of the incident recorded on the Officers' body-worn cameras. Exhibit 3 is an "Incident Detail Report," which is a printout of the NCIC information available to the officers at the time of the arrest. Finally, Exhibit 4 includes the police reports prepared by Officers Rasmussen and Ruden following the incident. For the following reasons, Exhibits 1, 2, and 3 will be considered for purposes of this motion, while Exhibit 4 will not be.

"When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside of the pleadings. . . ." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). However, the court may consider materials that (1) are "part of the public record," (2) "do not contradict the complaint," or (3) are "necessarily embraced by the pleadings." *Id.* (quotations omitted) (citing *Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999); and *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997)). Consideration of these narrow categories of materials does not operate to convert the motion to one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

The Court begins with the Officers' body-worn video. Where their authenticity and completeness are not in dispute, the Eighth Circuit and courts from this District have routinely

5

held that body-worn videos like the ones here are "embraced by the pleadings" and proper to consider on a motion to dismiss or motion for judgment on the pleadings. *E.g.*, *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021); *Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023); *Anderson v. St. Luke's Hospital*, No. 19-cv-106 (MJD/LIB), 2019 WL 7882118, at *3 n.5 (D. Minn. Nov. 19, 2019); *Verino v. Higgins*, No. 19-cv-3024 (DWF/LIB), 2020 WL 3542757, at *1 n.1 (D. Minn. June 30, 2020). The court does not need to "adopt the plaintiff's version of the facts if they are blatantly contradicted by video evidence." *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (cleaned up). Here, Mr. Crow not only does not dispute the authenticity or completeness of the body-worn video, but he also cites the video in his opposition. Pl.'s Opp'n at 3 (Doc. 21). Therefore, the Court finds Defendants' Exhibits 1 and 2 are embraced by the pleadings and considers them for purposes of this motion.

The Court will similarly consider the Incident Detail Report in Exhibit 3 because it is also embraced by the pleadings. The Incident Detail Report shows what information was available to the Officers from the NCIC system about Mr. Crow's car during the time of the incident.[2] This includes information about Mr. Crow and his connection to the vehicle; it links Mr. Redkettle to the vehicle; it states that Redkettle is a "wanted person"; it identifies that there is an active warrant for "5th degree drugs" for Mr. Redkettle; and it includes a warning about Redkettle that states "caution combative." Ex. 3 at 2. The system also identifies Mr. Redkettle as being five foot eleven

---

[2] An Incident Detail Report is an auto-generated document that shows when and how the Officers engaged with the NCIC system and what information was shown to them during their engagement. Unlike the police reports offered by Defendants, it includes no narrative elements. Instead it contains only a readout of the information from the NCIC system that the Officers accessed just before they pulled up behind Mr. Crow's vehicle and after they returned to the patrol car to verify his identity.

inches tall, weighing 160 pounds, and having scars on his face, forehead, left calf, left hand, and left wrist. *Id.* It also states that Johnny James Crow is a known alias used by Mr. Redkettle. *Id.*

Here, nothing in Exhibit 3 is extraneous to or contradicts the Complaint—indeed the information in Exhibit 3 is embraced by the pleadings because the only reasonable inference to be drawn from the video footage of the encounter and the allegations in the Complaint is that the Officers consulted the NCIC information contained in the Incident Detail Report before they engaged with Mr. Crow. As seen in the body-worn video, the Officers navigated through a database on their patrol car computer as they pulled into the gas station parking lot behind Mr. Crow's sedan. Ex. 1 at 0:01; Ex. 2 at 0:01. As the Officers began to detain Mr. Crow, they questioned if he goes by the name Redkettle. Compl. ¶ 17; Ex. 1 at 1:05. The Officers then stated that the car is connected to someone who has active felony warrants. Ex. 1 at 1:14. This sequence of events reveals virtually no possibility except that the Officers consulted the NCIC system before engaging with Mr. Crow. Further, like Exhibits 1 and 2, Mr. Crow relies on these facts in his characterization of the incident. Pl.'s Opp'n at 2–3. Therefore, the Court finds Exhibit 3 is embraced by the pleadings and will be considered for purposes of this motion.

The Court reaches the opposite conclusion about the police reports in Exhibit 4. The Court need not determine whether the reports are "necessarily embraced by the pleadings" because even if they were, the Court may not consider them for the truth of the matters asserted. *LeMay*, 18 F.4th at 289. In *LeMay*, the Eighth Circuit declined to consider a police report of the incident at issue at the motion-to-dismiss stage because the defendant did "not simply want [the court] to consider the police report's existence. He also want[ed the court] to accept its narrative as truth." *Id.* This is what the Defendants seek to do here. The reports primarily provide the Officers' narrative recounting of the incident. Ex. 4 (Doc. 12). Defendants refer to these reports multiple times in their

7

reply brief to support factual assertions about how the NCIC information impacted the Officers' thinking. Defs.' Reply at 7, 9–11 (Doc. 24). This effort to have the Court consider the police reports for the truth of the matters asserted therein is rejected, and the Court will not consider Exhibit 4 in determining the instant motion.

### C.   42 U.S.C. § 1983 Claim

In Count One of his Complaint, Mr. Crow alleges a § 1983 claim against the Defendants for violations of his Fourth and Fourteenth Amendment rights. He claims that the conduct of the Officers amounts to excessive force and unlawful arrest. The Court begins with the excessive force claim.

#### 1.   Excessive Force and the *Terry* Stop

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court held in *Terry v. Ohio* that law enforcement officers can make "brief, investigatory stop[s]" within certain limits. 392 U.S. 1 (1968). *Terry* created a two-part inquiry into (1) whether, at the outset, the investigatory stop was lawful, and (2) whether the manner of the stop "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20. First, a *Terry* stop is lawful at the outset if the officer has "reasonable suspicion supported by articulable facts" that some criminal activity may exist. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30). Second, even if the investigatory stop itself is reasonably supported, the manner of the stop "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011).

Excessive force claims under the Fourth Amendment are based on a reasonableness standard. *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006). "An officer's use of force violates

the Fourth Amendment if it was 'objectively unreasonable.'" *Pollreis v. Marzolf*, 9 F.4th 737, 747 (8th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 394–96 (1989)). Objective reasonableness is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Reasonableness is based on the factual circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers" and whether he is actively resisting arrest or attempting to evade arrest. . . ." *Pollreis*, 9 F.4th at 747 (quoting *Graham*, 490 U.S. at 396).

During a *Terry* stop, law enforcement is allowed to use "some degree of physical coercion" toward their investigatory ends. *Graham*, 490 U.S. at 396. The Eighth Circuit has held that in certain circumstances police officers may reasonably use handcuffs and place a suspect in a police patrol car during *Terry* stops. *See, e.g.*, *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (finding that placing the handcuffed suspect in the patrol car and transporting him to the scene of a bank robbery for a show-up identification did not transform a *Terry* stop into an arrest); *United States v. Maltais*, 403 F.3d 550, 553, 55–56 (8th Cir. 2005) (finding stop remained within bounds of *Terry* where suspect held in patrol car for at least 90 minutes while officer investigated whether suspect was a member of a drug smuggling operation); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (explaining that law enforcement can place the subject of a *Terry* stop in their patrol car if "reasonably necessary" to maintain the status quo or for police safety). To use handcuffs, the Fourth Amendment requires "some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *El-Ghazzawy*, 636 F.3d at 457 (quoting *Bennett v. City of*

9

*Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)). However, handcuffing a suspect "absent any concern for safety" violates the Fourth Amendment. *Id.* at 460.

Mr. Crow's excessive force arguments implicate the second prong of the analysis of whether a *Terry* stop is valid.[3] He alleges that the Officers used excessive force by handcuffing him and placing him in the patrol car during his detention. Mr. Crow argues that the Officers should have known that he was not Mr. Redkettle and that he did not pose any type of threat to the Officers because he was compliant. Therefore, Mr. Crow argues the Officers' use of handcuffs and his placement in the patrol car was unreasonable and excessive. Pl.'s Opp'n at 6–9. As explained below, the Court concludes the Defendants are entitled to judgment on the pleadings with respect to this claim.

Under the circumstances presented here, the Officers' use of handcuffs and their decision to place Mr. Crow in their patrol car while they completed a brief investigation was reasonably necessary. Although Mr. Crow asserts that the Officers had no justification for using handcuffs because he was compliant, presented no safety threat, identified himself as Mr. Crow and not Mr. Redkettle, and the Officers' pat down found no weapons, he overlooks other information available to Officers Rasmussen and Ruden that provided objective safety concerns from the perspective of an officer on the scene. *Graham*, 490 U.S. at 396 ("Reasonableness is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"). At the time of the detention, the Officers understood Mr. Crow's car to be connected

---

[3] There is no dispute that the Officers had reasonable articulable suspicion to make the *Terry* stop. The Officers ran Mr. Crow's license plate, which returned NCIC information that a person associated with the car, Narcisse Redkettle, had an active 5th degree drug warrant for his arrest. Ex. 3. The report further indicated that that person was a "wanted person." *Id.* This rises to the level of reasonable articulable suspicion for a lawful *Terry* stop of Mr. Crow and nowhere in Plaintiff's opposition to the motion for judgment on the pleadings did does he contest this point.

to Narcisse Redkettle, a "wanted person" who had at least one active drug warrant for his arrest. The NCIC information also cautioned that Redkettle was known to be "combative," which is not a scenario in which the "officers [had] no objective concerns for safety. . . ." *El-Ghazzawy*, 636 F.3d at 460. Further, when Mr. Crow verbally identified himself, that also confirmed what at the moment the Officers knew to be one of the many aliases used by Mr. Redkettle. And as the Officers stated on the scene, they were going to—and did—investigate the discrepancy between the name Mr. Crow gave them and the name associated with the warrant once they placed Mr. Crow in the patrol car, where he stayed for less than two minutes. Ex. 1 at 1:10, 1:28, 3:59; Ex. 2 at 2:08, 3:57. From these circumstances, the Officers could reasonably have believed that the use of handcuffs and patrol car was necessary for public or officer safety.

Mr. Crow argues that the Eighth Circui's decision in *El-Ghazzawy* clearly established that the Officers' use of handcuffs under these circumstances was unreasonable. But *El-Ghazzawy* is easily distinguishable. In that case, Karim El-Ghazzawy collected and sold wrist watches to a pawn shop on several occasions. A store manager believed that one of the watches El-Ghazzawy sold was a fake. The next time El-Ghazzawy returned to sell more watches to the shop, the manager contacted the police. 636 F.3d at 454–55. When the officer arrived on the scene, she handcuffed El-Ghazzawy before "even the most basic investigation" was undertaken for an alleged crime that did not raise a concern about him being armed or dangerous. *Id.* The Eighth Circuit noted that the officer failed to point to any specific facts that supported her concern for officer safety. *Id.* at 458–59.

This case is unlike *El-Ghazzawy* in meaningful ways. Here, the body-cam video shows that the Officers consulted the NCIC system before stopping Mr. Crow. Ex. 1 at 0:01; Ex. 2 at 0:01; Ex. 3. In the system they found an active warrant for a man linked to Mr. Crow's vehicle. The

11

NCIC report warned officers that Redkettle was considered "combative" and listed an active warrant for the possession of drugs, which the Eight Circuit has held creates a reasonable belief the suspect may be armed and dangerous. *Id.*; *Haynes v. Minnehan*, 14 F.4th 830, 836 (8th Cir. 2021); *United States v. Johnson*, 528 F.3d 575, 580 (8th Cir. 2008); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999). Additionally, identifying himself as Mr. Crow only confirmed what Rasmussen and Ruden knew to be an alias for Redkettle. Mr. Crow did everything that was asked of him by the Officers, staying admirably calm and compliant amidst an uncertain situation. But, the information available to the Officers provided a reasonable basis for their use of handcuffs and decision to place Mr. Crow in the patrol vehicle to maintain the status quo while they completed their investigation.

Mr. Crow disputes that the Officers saw the "caution combative" comment on the NCIC report, suggesting that it is reasonable to infer that the Officers did not read that part of the information reflected in the Incident Detail Report. Pl.'s Opp'n at 7–8. The Court disagrees—to draw such an inference would be unreasonable in light of the encounter captured on the body-cam video. The Incident Detail Report shows that the "caution combative" line on the NCIC report fell between Mr. Redkettle's physical description and the details of his open warrant above and his list of known aliases below. If the Officers knew at the time of the stop the information that straddled it, it is not reasonable to conclude that the Officers did not see the "caution combative" comment in the NCIC system.

Similarly, Mr. Crow contends that the inclusion of "combative" in the NCIC system does not necessarily mean that Redkettle is prone to violence, but rather that he has an "argumentative demeanor." Pl.'s Opp'n at 8. That construction contradicts both the plain language and most natural police-related use of the word. The average person would use combative to mean physical

12

adversariness. *Combative*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/combative (last visited Mar. 25, 2024) (defining "combative" as "marked by eagerness to fight or contend"). In the police context, that use seems even more likely. While a "fight" could also mean a verbal altercation, it does not follow that the police would use "combative" to describe a suspect they verbally disagree with. In total, the Officers made a constitutionally valid *Terry* stop and did not use excessive force during Mr. Crow's detention.

### 2. De Facto Arrest

Next, Mr. Crow contends that his detention turned from a *Terry* stop into a de facto arrest, which was unconstitutionally made without probable cause. Pl.'s Opp'n at 9–11. However, the Court concludes that it is unnecessary to determine whether the Officers had probable cause to arrest Mr. Crow because the *Terry* stop in this case never became an arrest.

The Eighth Circuit has held that "'an action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop.'" *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992) (quoting *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir. 1984)) (brackets removed). Specifically, a lawful *Terry* stop "may become an arrest, requiring probable cause, 'if the stop lasts for an unreasonably long time or if officers use unreasonable force.'" *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (quoting *Navarrete–Barron*, 192 F.3d at 790). Courts consider an array of factors when determining if an investigative stop became an arrest, including:

> the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

13

*United States v. Jones*, 759 F.2d 633, 639–40 (8th Cir. 1985).

Mr. Crow maintains that his *Terry* stop transformed into an arrest without probable cause because the Officers detained him unreasonably. He argues that the Officers' actions were more intrusive than necessary because the facts show that he was compliant with the Officers, they found no weapons on him and were given no reason to fear for their safety, he told the Officers he was not Redkettle, and his description did not match the description of Redkettle in the NCIC information. Pl.'s Opp'n at 10–11. These facts, he contends, in combination with the Officers' use of handcuffs and placing him in the patrol car, transformed his *Terry* stop into an arrest.

The Court disagrees with this analysis. First, the Officers did not detain Mr. Crow for an "unreasonably long time." *Newell*, 596 F.3d at 879. The Supreme Court has held that, while there is no bright line, when asking whether police have detained a suspect for too long to call the encounter a *Terry* stop, the issue is whether law enforcement "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) ("There is no bright line rule"). That is precisely what Officers Rasmussen and Ruden did in this case. The entire encounter lasted less than five minutes. Mr. Crow was in handcuffs for less than three minutes, and he was in the patrol car for less than two minutes. During that brief period, the Officers quickly took steps to confirm whether or not Mr. Crow was the individual with an active warrant identified as Narcisse Redkettle by the NCIC information in their patrol car computer. The Eighth Circuit has routinely held that comparable durations do not transform a *Terry* stop into an arrest. *See Pollreis*, 9 F.4th 737 at 746 (handcuffing juvenile suspects for two minutes during an entire encounter that lasted seven minutes did not turn *Terry* stop into an arrest); *Irvin v. Richardson*, 20 F.4th 1199, 1207 (8th Cir. 2021) (handcuffing two suspects for thirteen minutes

14

did not turn stop into an arrest); *Chestnut v. Wallace*, 947 F.3d 1085, 1087–88 (8th Cir. 2020) (handcuffing a compliant suspect during a warrant check for twenty minutes, even following a pat-down that identified no weapons, did not transform stop into an arrest). The Court finds that Officers Rasmussen and Ruden did not detain Mr. Crow longer than was necessary to correctly determine his identity, at which point they took him out of the patrol car, removed the handcuffs, apologized, and told him he was free to go.

The Court is also not persuaded by Mr. Crow's argument that the investigative detention turned into an arrest due to the Officers' alleged use of excessive force. Mr. Crow again highlights the Officers' use of handcuffs and placement in the patrol car to this end. Pls.' Opp'n at 11. However, as described above, the use of handcuffs under these circumstances was not excessive force. Where, as here, there is an objective safety concern, law enforcement may detain a suspect using handcuffs while verifying the person's identity. *See Pollreis*, 9 F.4th at 741–42, 744 (handcuffing and frisking two boys before verifying their identities was not unreasonable). Additionally, in *United States v. Lego*, the Eighth Circuit held that confining a potentially dangerous suspect to a patrol car while checking his identification was not tantamount to an arrest. 855 F.2d 542 (8th Cir. 1988). This precedent reiterates that the Officers' conduct here did not constitute excessive force and did not transform Mr. Crow's stop into an arrest.

Weighing the *Jones* factors also supports the same conclusion. First, the encounter was not particularly "police dominated," as it involved only two officers arriving in one patrol car. *Jones*, 759 F.2d at 640. Second, the Officers were aware an open warrant for a drug-related crime, which the Eighth Circuit has held creates a reasonable belief the suspect may be armed and dangerous. *Haynes*, 14 F.4th at 836; *Johnson*, 528 F.3d at 580; *Navarrete-Barron*, 192 F.3d at 791. Third, the Officers had reasonable articulable suspicion to make the stop and were cautioned by the NCIC

15

information that Redkettle was a wanted person and known to be combative. Factor four weighs in favor of Mr. Crow, as he was undoubtedly compliant with the Officers and showed no suspicious or erratic behavior. However, fifth and finally, the opportunity for the Officers to make an arrest on an open warrant, and doing so with reasonable means, cuts against him. Together, the *Jones* factors support the conclusion that the *Terry* stop of Mr. Crow did not transform into an arrest.

For these reasons, the Court finds that the lawful *Terry* stop in this case never transformed into an arrest, and as a result, no showing of probable cause was necessary to justify Mr. Crow's brief detention.

### 3. Mistaken Identity

Mr. Crow additionally argues that the Officers' mistake of identity gives rise to a Fourth Amendment violation. Specifically, Mr. Crow contends that the Officers were unreasonable in mistaking Mr. Crow for Redkettle. Since the car was registered to Mr. Crow alone and he had no outstanding warrants, he suggests that there is only a "tenuous" connection between Mr. Crow and Redkettle. Pl.'s Opp'n at 13. But a mistake of identity by law enforcement rarely constitutes a constitutional violation. The Supreme Court has held that the Fourth Amendment is generally not violated when a person is mistakenly detained pursuant to a valid warrant for another individual. *Baker v. McCollan*, 443 U.S. 137, 143–45 (1979). In *McCollan*, the Court observed that the ultimate innocence of the stopped individual does not suffice to allege a constitutional violation. *Id.* at 145.

Critically, there is no Fourth Amendment violation in a case of mistaken identity if law enforcement had a "reasonable, good faith belief" that the individual they stopped is the suspect they are pursuing. *Hill v. California*, 401 U.S. 797, 802–03 (1971). In *Hill v. California*, the Supreme Court held that law enforcement did not act unreasonably when arresting a man who fit

16

the description of the individual they had probable cause to arrest, but who identified himself by another name. *Id.* Those facts are directly analogous to the circumstances here. The Officers engaged Mr. Crow under a valid arrest warrant for Redkettle, who was listed as five foot eleven inches tall and 160 pounds. Mr. Crow is listed as six feet tall and 180 pounds, with only a one-inch difference in height and twenty pounds in weight from Redkettle. A mistake based on this slight difference in height and size can hardly be seen as unreasonable. While the NCIC system also states that Redkettle has scars on his face, forehead, left calf, left hand, and left wrist, Mr. Crow's similarity in size and stature—as well as the use of his name as an alias of Redkettle—does not make the Officers' mistake unreasonable.

Mr. Crow further asserts that a reasonable officer would have done more to inquire into Mr. Crow's identity before detaining him. Pl.'s Opp'n at 12–13. Specifically, Mr. Crow suggests that the Officers should have investigated the link between the open warrant for Redkettle and Mr. Crow's car registration before stopping and detaining him. *Id.* But the Fourth Amendment does not impose a duty on law enforcement to fully investigate claims of mistaken identity. *McCollan*, 443 U.S. at 145–46. Even a failure to do so does not make the Officers' mistake unreasonable, and here there was no such failure.

Even had the brief mistaken identity in this case been negligent, the Eighth Circuit has held it does not constitute a constitutional violation. *Lane v. Sarpy County*, 165 F.3d 623 (8th Cir. 1999) (summary judgment). In *Lane*, "the defendants mistakenly arrested and detained plaintiff for approximately six hours, believing him to be a different individual with the same name" for whom they had an arrest warrant. *Id.* at 623–24. The *Lane* court affirmed the district court's grant of summary judgment to the defendants because the errors in preparation and execution of the arrest warrant were nothing more than negligent conduct that was insufficient to establish a constitutional

violation. *Id.* at 624 ("Because plaintiff cannot establish a constitutional violation, defendants are entitled to summary judgment based on qualified immunity."). The Eighth Circuit later affirmed that principle under similar facts to the circumstances here. In *Young v. City of Little Rock*, Ms. Young was arrested and detained for hours under a warrant issued for her sister-in-law who had used Young's name as an alias. 249 F.3d 730, 732 (8th Cir. 2001). The Eighth Circuit found that the district court properly dismissed any claim against the arresting officer and the dispatching officer who mistakenly verified that there was an arrest warrant for Ms. Young. The *Young* court held that the mistake was "nothing more than negligence," citing the conditions surrounding police decision-making, and determined that no § 1983 claim was stated against these officers. *Id.* at 734 (citing *Sarpy County*, 165 F.3d at 624 and noting that "the mistake was not deliberate [but] was occasioned, rather, by the press of business and by the speed with which officers . . . were required to act").[4]

Following the rationale of both *Lane* and *Young*, and viewing the facts alleged in the light most favorable to Mr. Crow, Officers Rasmussen and Ruden would *at most* have been negligent in initially mistaking him for Redkettle. Nothing in the Complaint, the body-cam video, or in the NCIC report suggests a reasonable inference that the Officers acted maliciously, intentionally, or even recklessly in believing that they were making an arrest of the individual who was the subject of the active warrant linked to the vehicle they saw in the gas station parking lot.

---

[4] Even after Ms. Young was taken to the county jail and the arresting officer and his superior officer learned of the issue of mistaken identity, they did not immediately release her. *Young*, 249 F.3d at 734–35. Still, the *Young* court disagreed that Ms. Young's claim regarding this continued detention should have gone to a jury because "the situation was equivocal." *Id.* at 735. The officers had some information indicating that Ms. Young was the subject of a valid warrant and other information indicating that they had made a mistaken arrest, so the court concluded that "an objectively reasonable officer could have decided to wait for a judge to make the final determination," and as a result, the officers were entitled to qualified immunity. *Id.* ("[A] reasonable officer could have thought it reasonable to wait for a judge's decision.").

In sum, the Officers' actions were reasonable under the circumstances and do not plausibly violate the Fourth Amendment for excessive force, unlawful arrest, or mistaken identity. Therefore, the 42 U.S.C. § 1983 claim is dismissed.

### D. False Arrest Claim

Finally, Mr. Crow brings a common law false arrest claim under Minnesota state law. *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quoting *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (1974)). District Courts have supplemental jurisdiction over state law claims when they are "so related to" the federal law claims in that action. 28 U.S.C. § 1331, 1367(a). However, a district court may decline to exercise supplemental jurisdiction over a state law claim when the court dismisses the accompanying federal claims. *Id.* § 1367(c)(3). Here, because the § 1983 claim has been dismissed, the Court declines to exercise jurisdiction over the state law claim. Therefore, the Court dismisses the false arrest claim without prejudice.

## III. CONCLUSION

Although likely little consolation, it is worth reiterating the Court's appreciation of Mr. Crow's compliance with law enforcement during his mistaken and unfortunate detention. Mr. Crow was ultimately stopped, handcuffed, and detained due to an error in the police's NCIC system. Mr. Crow did nothing wrong and did not deserve such an upsetting—and painful—incident. There is little doubt that without Mr. Crow's compliance and calm demeanor this incident could have resulted in something much more serious.

One more piece of this incident is also worth highlighting: As the Officers released Mr. Crow and apologized to him, they stated that Mr. Crow should contact the Minnesota Bureau of Criminal Apprehension to remove Redkettle's affiliation with his car from their system. It is unclear to the Court why the City of Minneapolis, the Minneapolis Police Department, or the

Officers themselves would not instead take on the responsibility of resolving this error for him. It is clear from this incident that an inaccurate NCIC system poses a threat to innocent citizens, especially when faced with the possibility of being detained, searched, handcuffed, and placed in a patrol car "simply because some bureaucrat has failed to maintain an accurate computer database." *Arizona v. Evans*, 514 U.S. 1, 23 (1995) (Stevens, J., dissenting). This is especially true when law enforcement information is shared, "infect[ing] not only one agency, but the many agencies that share access to the database." *Evans*, 514 U.S. at 26 (Ginsberg, J., dissenting). Ultimately, this is law enforcement's issue to fix. Failure to do so threatens to make this unfortunate incident a reality again. The Court encourages the City of Minneapolis to take affirmative steps to ensure that Mr. Crow does not face a repeat of the kind of encounter that precipitated this litigation.

**IV.   ORDER**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Judgment on the Pleadings, Doc. 15, is **GRANTED**;

2. Plaintiff's Complaint is **DISMISSED**. Plaintiff's 42 U.S.C. § 1983 claim (Count 1) is **DISMISSED** with prejudice, and Plaintiff's false arrest claim (Count 2) is **DISMISSED** without prejudice pursuant to 28 U.S.C. § 1367(c).

Let Judgment be entered accordingly.

Date: May 7, 2024                                   *s/Katherine Menendez*
                                                    Katherine Menendez
                                                    United States District Judge